COURT OF CHANCERY
OF THE
STATE OF DELAWARE

BONNIE W. DAVID
VICE CHANCELLOR

COURT OF CHANCERY COURTHOUSE
34 THE CIRCLE
GEORGETOWN, DE 19947

Date Submitted: February 6, 2025
Date Decided: February 19, 2025

Andrew S. Dupre, Esq.
Brian R. Lemon, Esq.
Akerman LLP
222 Delaware Ave., Suite 1710
Wilmington, DE 19801

Richard A. Barkasy, Esq.
Santoro Law Group LLC
1000 N. West St., Suite 1200
Wilmington, DE 19801

RE:  *Ferguson Enterprises, LLC v. RAKJR Co., et al.*,
C.A. No. 2023-0840-BWD

Dear Counsel:

In July 2023, Ferguson Enterprises, LLC ("Ferguson"), RAKJR Company ("RAKJR"), and Robert A. Kennedy, Jr. ("Kennedy") entered into an Asset Purchase Agreement ("APA") under which Ferguson acquired RAKJR's business. Shortly thereafter, a dispute arose over whether the assets transferred under the APA included the acquired business's Microsoft Office 365 account. When Kennedy, who continued to work for the acquired business, denied Ferguson access to that account, Ferguson terminated his employment. Kennedy now seeks a severance payment under his employment agreement on grounds that he was not properly terminated for cause.

This letter opinion resolves Ferguson's motion for judgment on the pleadings (the "Motion") on Kennedy's counterclaim seeking a severance payment. The Motion raises a material issue of fact that precludes entry of judgment on the pleadings and is, therefore, denied.

## I. BACKGROUND

### A. The APA And The Employment Agreement

On July 24, 2023, Ferguson, RAKJR, and Kennedy entered into the APA, under which Ferguson acquired RAKJR's business. Verified Compl. [hereinafter Compl.], Ex. A [hereinafter APA], Dkt. 1.

The APA contemplated that, for a forty-five-day "Transition Period" (or other mutually agreed period) after closing, RAKJR would "lease" certain employees of the acquired business to Ferguson:

> During the period commencing on the Closing Date and ending forty-five (45) days following the Closing Date, or such other period as [RAKJR] and [Ferguson] mutually agree (the "Transition Period"), [RAKJR], subject to [Ferguson]'s obligations in clause (b) below, agrees to (i) lease to [Ferguson] during the Transition Period [RAKJR]'s employees designated by [Ferguson] (the "Covered Employees"), (ii) pay all wages, vacation and sick pay (in each case, in the amounts approved by [Ferguson] or, with respect to Covered Employees that are entering into employment agreements with [Ferguson] in connection with the Closing, in the amounts provided in such employment agreements), payroll taxes and other payroll related charges due to, or payable in connection with, the lease of the Covered Employees to [Ferguson], (iii) provide workers' compensation

insurance coverage for the Covered Employees and (iv) provide the Covered Employees with insurance and health care benefits of the same type and nature offered to [RAKJR]'s active employees prior to the Closing Date (except, with respect to Covered Employees that are entering into employment agreements with [Ferguson] in connection with the Closing, as otherwise may be provided in such employment agreements and excluding automobile insurance).

APA § 6.11(a). The APA directed that, "[a]t the end of the Transition Period, [RAKJR] shall terminate all of the Covered Employees so that [Ferguson] may employ them." *Id.* It further provided that, "[d]uring the Transition Period, [Ferguson] shall have the authority to designate tasks to be performed by the Covered Employees related to the Business, and shall have the authority to instruct and oversee Covered Employees in the manner, means and method of accomplishing such work to be performed[,]" and that "[RAKJR] agrees to follow [Ferguson]'s reasonable instructions as to the day to day management of the Covered Employees and to instruct Covered Employees to comply with [Ferguson]'s reasonable instructions." *Id.* § 6.11(c).

In connection with the APA, Ferguson and Kennedy entered into an Employment Agreement (the "Employment Agreement"). Def. Robert A. Kennedy, Jr.'s Countercl. [hereinafter Kennedy CC] ¶ 3, Dkt. 78. The Employment Agreement states that "[Ferguson] agrees to employ [Kennedy], and [Kennedy] agrees to be employed by [Ferguson], for the period commencing on the first day

following the expiration of the Leasing Arrangement and ending on the one (1) year anniversary of the date hereof (the 'Term'), unless earlier terminated in accordance with the terms of this Agreement . . . ." Defs.' Answer to Pl.'s Compl. and Countercl., Ex. A [hereinafter Empl. Agmt.] ¶ 2, Dkt. 32. The Employment Agreement further states:

> Between the period from the date hereof through the last day of the Leasing Arrangement, [Kennedy] shall be a leased employee of [RAKJR]. If [Kennedy] remains in [Ferguson]'s employment following the expiration of the Term, [Kennedy] shall be an employee "at will," employed solely at the discretion of [Ferguson] and not entitled to any rights under this Agreement, except as otherwise may be granted by [Ferguson] in its sole discretion.

*Id.*

The Employment Agreement permits Ferguson "to terminate immediately [Kennedy]'s employment hereunder during the Term with or without 'Cause' (as hereinafter defined)." *Id.* ¶ 6(b). But Kennedy's entitlement to a severance payment depends on whether he was terminated with or without Cause:

> (ii) In the event [Kennedy]'s employment with [Ferguson] is terminated prior to the end of the Term (A) by [Ferguson] for Cause . . . [Kennedy] shall be entitled to receive, and [Ferguson] agrees to pay, solely any unpaid Base Pay due to [Kennedy] hereunder to the date of termination (including payment of any unpaid reimbursable expenses, any accrued, but unused, vacation time and such other benefits required to be paid in accordance with applicable law and [Ferguson]'s policy as of the date of termination). . . .

> (iii)   In the event [Kennedy]'s employment with [Ferguson] is terminated prior to the end of the Term (A) by [Ferguson] without Cause . . . [Kennedy] shall be entitled to receive, and [Ferguson] agrees to pay, solely (A) any unpaid Base Pay due to [Ferguson] hereunder to the date of termination . . . and (B) [a severance payment] . . . .

*Id.* ¶¶ 6(e)(ii)–(iii).

## B.   Ferguson Files Suit And Terminates Kennedy's Employment.

On August 16, 2023, Ferguson initiated this action through the filing of a Verified Complaint (the "Complaint").  The Complaint alleges that Defendants breached the APA by failing to deliver the acquired business's Microsoft Office 365 account (the "O365 Account").  Compl. ¶ 57.

The Closing Date under the APA was July 24, 2023.  Accordingly, the forty-five-day Transition Period ended on September 7, 2023.  Two days earlier, on September 5, Ferguson sent a letter to Kennedy (the "Termination Letter") purporting to terminate his employment for Cause under Section 6(b) of the Employment Agreement due to his "deliberate misappropriation" of the O365 Account.  Kennedy CC ¶ 9; Pl.'s Opening Br. in Supp. of Pl.'s Mot. for J. on the Pleadings on Def. Kennedy's Countercl., Ex. 2 [hereinafter Termination Letter], Dkt. 86.[1]

---

[1] The Termination Letter also cited breach of the Employment Agreement's non-solicitation provision as a basis for termination.  Termination Letter at 1–2.

On December 1, 2023, Vice Chancellor Glasscock, to whom this action was assigned, held a one-day trial to determine whether Ferguson had purchased the O365 Account under the APA. Dkt. 69. In a January 16, 2024 post-trial oral ruling (the "Bench Ruling"), the Court found that "[t]he APA requires the seller to convey the [O365 Account] to Ferguson[,]" "[t]he [O365 Account] is a purchased asset under the APA, and Ferguson is the rightful owner of the [O365 Account]." Tr. of Jan. 16, 2024 Tel. Rulings of the Ct. [hereinafter Bench Ruling] 15:1–5, Dkt. 72. The Court further found that "[a]fter the parties closed, [D]efendants denied Ferguson access to the company's IT system that ran the [O365 Account]." *Id.* at 6:19–24.

In a February 13, 2024 Order of Partial Judgment and Permanent Injunction implementing the Bench Ruling, the Court entered "[j]udgment on liability only . . . in favor of [Ferguson] and against . . . RAKJR . . . on Count I of the Verified Complaint (Breach of Contract), declaring that the O365 Account was part of the Purchased Assets under the [APA]." Dkt. 74 at 1.

On April 4, 2024, Defendants amended their counterclaims (the "Amended Counterclaims"). Count I of Kennedy's Amended Counterclaims alleges a claim for breach of the Employment Agreement based on Ferguson's refusal to pay Kennedy a severance payment after his termination. Kennedy CC ¶¶ 11–16. On April 22,

2024, Ferguson filed the Motion, seeking judgment on the pleadings with respect to that counterclaim. Dkt. 81.[2] This action was reassigned to me on January 8, 2025, and the Court heard oral argument on the Motion on February 6. Dkts. 109, 115.

## II.    ANALYSIS

"This court will grant a motion for judgment on the pleadings pursuant to Rule 12(c) when there are no material issues of fact and the movant is entitled to judgment as a matter of law." *Menna v. Weidhaas*, 2023 WL 4851547, at *6 (Del. Ch. July 28, 2023) (quoting *Lillis v. AT & T Corp.*, 904 A.2d 325, 329 (Del. Ch. 2006)). "[J]udgment on the pleadings . . . is a proper framework for enforcing unambiguous contracts because there is no need to resolve material disputes of fact." *Id.* (alteration and ellipsis in original) (quoting *Lillis*, 904 A.2d at 329–30).

Ferguson contends that under the plain terms of the Employment Agreement, Kennedy is not entitled to a severance payment because he was terminated before the Term of the Employment Agreement began. Ferguson further argues that, even

---

[2] On May 22, 2024, Ferguson filed its opening brief in support of the Motion. Pl.'s Opening Br. in Supp. of Pl.'s Mot. for J. on the Pleadings on Def. Kennedy's Countercl. [hereinafter OB], Dkt. 86. On June 28, 2024, Defendants filed an answering brief in opposition to the Motion. Defs.' Answering Br. in Opp. to Pl.'s Mot. for J. on the Pleadings on Def. Kennedy's Countercl. [hereinafter AB], Dkt. 92. On July 22, 2024, Ferguson filed a reply brief in further support of the Motion. Pl.'s Reply Br. in Supp. of Pl.'s Mot. for J. on the Pleadings on Def. Kennedy's Countercl. [hereinafter RB], Dkt. 100.

if Kennedy had been terminated during the Term of the Employment Agreement, he was terminated for Cause for "misappropriating" the O365 Account, a fact that was established in the Bench Ruling.

Kennedy responds that material issues of fact foreclose resolution on the pleadings—Kennedy contends that he was, in fact, terminated during the Term of the Employment Agreement, and that the Bench Ruling did not find that he "misappropriated" the O365 Account by acting dishonestly.

### A. The Employment Agreement Entitles Kennedy To A Severance Payment Unless He Was Terminated For Cause.

The parties first dispute whether Kennedy was terminated before or during the Term of the Employment Agreement.

The Employment Agreement defines the "Term" as "the period commencing on the first day following the expiration of the Leasing Arrangement and ending on the one (1) year anniversary of the date hereof[,]"[3] while the APA defines the "Transition Period" for the Leasing Arrangement as "the period commencing on the Closing Date and ending forty-five (45) days following the Closing Date, *or such other period as [RAKJR] and [Ferguson] mutually agree . . . .*" APA § 6.11(a) (emphasis added). Ferguson contends that the parties did not mutually agree on

---

[3] Empl. Agmt. ¶ 2.

another period.  RB at 3–4.  Kennedy says that they did, pointing out that by the time he was terminated, Ferguson had already taken over payroll, and the Termination Letter itself purported to terminate him under the Employment Agreement.

Based on my reading of the plain language of the Employment Agreement, however, the Court does not need to resolve whether Kennedy was terminated before or during the Term of the Employment Agreement, because the Employment Agreement requires a severance payment in either event (unless Kennedy was terminated for Cause).  Paragraph 2 of the Employment Agreement contemplates that Kennedy could be terminated before the Term "in accordance with the terms of this Agreement."  Empl. Agmt. ¶ 2 ("[Ferguson] agrees to employ [Kennedy] . . . for the [Term], unless earlier terminated in accordance with the terms of this Agreement . . . .").  The "terms of th[e] [Employment] Agreement" include severance payment provisions under Paragraph 6(e), which apply "[i]n the event [Kennedy]'s employment with [Ferguson] is terminated *prior to the end of the Term*."  *Id.* ¶¶ 6(e)(ii)–(iii) (emphasis added).

The parties dispute whether Kennedy was terminated before or during the Term but agree that he was "terminated prior to the end of the Term."  Under the plain language of the Employment Agreement, Kennedy is entitled to a severance payment unless he was terminated for Cause.

### B.    The Court Cannot Determine Whether Kennedy Was Terminated For Cause On The Current Record.

Kennedy's entitlement to a severance payment depends on whether he was appropriately terminated for Cause.

Ferguson contends that the Court's factual findings in the Bench Ruling establish that Kennedy's for-Cause termination was proper. Ferguson purported to terminate Kennedy for six "specific actions constituting Cause[,]" including "misappropriation of Ferguson's property."[4] Termination Letter at 1. According to Ferguson, the Bench Ruling established that Kennedy misappropriated Ferguson's property when it found that "[D]efendants denied Ferguson access to the [O365 Account]." *See* RB at 6–8. Kennedy, on the other hand, responds that "misappropriation" requires more than withholding an asset that Kennedy believed

---

[4] In its reply brief, Ferguson also argues that the Bench Ruling established that Kennedy "harm[ed] the Company," providing a separate basis for termination for Cause. *See* RB at 8–9; *see also* Empl. Agmt. ¶ 6(b)(i) (including as a basis for termination for Cause "the continued performance by the Employee of acts or omissions . . . which harm [Ferguson]"). Notably, the Termination Letter did not include this as a basis for Kennedy's termination. And, under the Employment Agreement, termination for Cause based on harm to Ferguson requires written notice and a "reasonable opportunity (not less than twenty (20) business days) to conform the Employee's conduct in accordance with such notice and accompanying direction and instruction." Empl. Agmt. ¶ 6(b)(i). But in any event, because Ferguson raised this argument for the first time in its reply brief, it is waived. *See, e.g.*, *Franklin Balance Sheet Inv. Fund v. Crowley*, 2006 WL 3095952, at *4 (Del. Ch. Oct. 19, 2006) ("Under the briefing rules, a party is obliged in its motion and opening brief to set forth all of the grounds, authorities and arguments supporting its motion. A movant should not hold matters in reserve for reply briefs.").

in good faith was not transferred under the APA—it requires dishonest intent. *See* AB at 16, 19–20.

To support its position that "misappropriation" requires only unauthorized use, and not dishonest intent, Ferguson cites decisions resolving disciplinary proceedings against New Jersey attorneys for misappropriation of client funds.[5] That authority does not apply here.[6] Instead, the word "misappropriation" in the contract—which is governed by New Jersey law[7]—"must be given [its] 'plain and ordinary meaning.'" *Schor v. FMS Fin. Corp.*, 814 A.2d 1108, 1112 (N.J. Super. Ct. App. Div. 2002) (quoting *Nester v. O'Donnell*, 693 A.2d 1214, 1220 (N.J. Super. Ct. App. Div. 1997)).

---

[5] *See, e.g.*, *Matter of Wade*, 275 A.3d 426, 435 (N.J. 2022) ("The Court defined 'misappropriation' as 'any unauthorized use by the lawyer of clients' funds entrusted to him, including not only stealing, but also unauthorized temporary use for the lawyer's own purpose, whether or not he derives any personal gain or benefit therefrom.'" (quoting *Matter of Wilson*, 409 A.2d 1153, 1155 n.1 (N.J. 1979))).

[6] Ferguson does not argue that "misappropriation" is a trade term or legal term of art with "a specialized or accepted usage[,]" much less that the term should be defined by its usage in the attorney discipline context. *See Kaufman v. Provident Life and Cas. Ins. Co.*, 828 F.Supp. 275, 283 (D.N.J. 1992) (explaining that, while terms are given their "plain and ordinary meaning[,]" "certain terms . . . will be considered in the context in which the agreement was drafted: Trade terms, legal terms of art . . . should be interpreted in accord with their specialized or accepted usage . . . ." (quoting *Nevets C.M., Inc. v. Nissho Iwai Am. Corp.*, 726 F.Supp. 525, 533 (D.N.J. 1989))).

[7] Empl. Agmt. ¶ 15.

Dictionaries define "appropriate" as meaning "to take or make use of without authority or right."[8] To "misappropriate" means "to appropriate wrongly (as by theft or embezzlement)."[9] The Bench Ruling found that Kennedy appropriated Ferguson's property by withholding the O365 Account.[10] It stopped short of finding that he did so "wrongly." Whether Ferguson misappropriated—*i.e.*, wrongly appropriated—the O365 Account raises a material issue of fact that precludes entry of judgment on the pleadings.

---

[8] *Appropriate*, Merriam-Webster, https://www.merriam-webster.com/dictionary/appropriate (last visited Feb. 19, 2025).

[9] *Misappropriate*, Merriam-Webster, https://www.merriam-webster.com/dictionary/misappropriate (last visited Feb. 19, 2025). The Oxford English Dictionary defines "misappropriate" as meaning "[to] appropriate or assign wrongly; *esp.* to apply dishonestly (money belonging to another) to one's own use; to embezzle." *Misappropriate*, Oxford English Dictionary, https:///www.oed.com/dictionary/misappropriate_v?tab=meaning_and_use (last visited Feb. 13, 2025). *See also Salzano v. North Jersey Media Gp. Inc.*, 993 A.2d 778, 793 (N.J. 2010) (noting that "[i]n common parlance, the terms 'misappropriate' and 'steal' are equivalent," and looking to the dictionary definition of misappropriation as "[t]o appropriate wrongly" and "[t]o appropriate dishonestly for one's own use: Embezzle"); *Haggerty v. Badkin*, 66 A. 420, 483–84 (N.J. Ch. 1907) (looking to the dictionary definition of misappropriation to require that "[t]he party must have known and felt at the time that he was misappropriating the money").

[10] In the Bench Ruling, the Court considered the parties' post-closing conduct and other extrinsic evidence to determine whether they intended to exclude the O365 Account from transfer under the APA. *See* Bench Ruling at 8:18–21, 14:16–23. It did not consider that evidence with an eye to resolving Kennedy's entitlement to a severance payment.

## III.  CONCLUSION

For the reasons explained above, the Motion is DENIED.

Sincerely,

*/s/ Bonnie W. David*

Bonnie W. David
Vice Chancellor


cc:  All counsel of record (by File & ServeXpress)